UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                             :

NORMA LLANOS,                          :
               Plaintiff,    :

                             :       11 Civ. 3953 (DLC)

       -v-                             :
                             :       OPINION & ORDER

CITY OF NEW YORK (DEPARTMENT OF PARKS   :
AND RECREATION),
               Defendant.    :
                             :
----------------------------------------X

Appearances:

For Plaintiff:

Sarah Fern Meil
67 Bridge Street
P.O. Box 145
Milford, NJ 08848

For Defendant:

Jane Elizabeth Andersen
New York City Law Department
100 Church Street
New York, NY 10007

DENISE COTE, District Judge:

     Defendant the City of New York, Department of Parks and

Recreation ("Parks Department"), moves for summary judgment in

this employment discrimination action brought by Norma Llanos

("Llanos"), a former employee.  Llanos alleges that the Parks

Department terminated her employment because she is an Hispanic

woman, subjected her to a hostile work environment, and

retaliated against her for complaining about discriminatory

conduct in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), as well as various provisions of the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. ("NYHRL"), and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-101 et seq. ("NYCHRL").[1] Llanos also claims disability discrimination under the Americans with Disabilities Act, 42 U.S.C. § 12112(a) et seq. ("ADA"), for the defendant's failure to accommodate her diabetes by providing her with a regularly scheduled, uninterrupted lunch break.

The Parks Department asserts that it fired the plaintiff principally because she attempted to cover-up the fact that she had damaged one of its vehicles.  For the following reasons, the defendant's motion for summary judgment is granted in part. Each of the plaintiff's claims is dismissed except her claims asserting the existence of a hostile work environment.

I.  BACKGROUND

Unless otherwise noted, the following facts are undisputed, taken from the plaintiff's deposition,[2] or taken in the light

---

[1] Although the complaint also alleges discrimination on the basis of age and national-origin, Llanos withdrew these claims in her response to the Parks Department's motion for summary judgment.

[2] In opposition to this motion for summary judgment, Llanos has submitted a declaration regarding the December 4, 2009 accident, discussions about her diabetes, and the investigation into missing items at the Williamsbridge Oval Recreation Center.

most favorable to the plaintiff.  Llanos, a self-identified

"Hispanic" female, worked for the defendant from 1981 to 2010.

Throughout this period, Llanos was a provisional (non-permanent)

employee.

From 2004 to 2008, Llanos held the civil service title of

Recreation Supervisor and, in this role, managed the

Williamsbridge Oval Recreation Center ("Oval").  On April 20,

2008, Llanos became a Parks Supervisor and was assigned to

District 12 in the Bronx.  Due to her provisional employment

status, Llanos was required to serve a two-year probationary

period in her new role.[3]  As a Parks Supervisor, Llanos's duties

included managing approximately thirty Job Training Participants

("JTPs"), assigning JTPs to various tasks, inspecting parks and

playgrounds in the district, reviewing time cards, and

distributing paychecks.  Llanos also had supervisory authority

over the City Parks Workers ("CPWs") in her district.

In January 2009, Llanos was transferred from District 12 to

District 8.  In District 8, Llanos retained her title as Parks

---

"Factual allegations that might otherwise defeat a motion for
summary judgment will not be permitted to do so when they are
made for the first time in the plaintiff's affidavit opposing
summary judgment and that affidavit contradicts the plaintiff's
own prior deposition testimony."  Rubens v. Mason, 387 F.3d 183,
192 (2d Cir. 2004) (citation omitted).  Therefore, to the extent
that Llanos's declaration contradicts her deposition testimony,
it has been disregarded.

[3] Llanos's probationary term was scheduled to conclude after the
termination of her employment.

Supervisor, continued her probationary status, and maintained similar responsibilities.  Two other Parks Supervisors, Ray Napolitano ("Napolitano") and Ralph Vialet ("Vialet"), worked in District 8 at the time.

Principal Parks Supervisor Gerald Dugal ("Dugal") served as Llanos's direct supervisor in District 8, along with Administrative Parks and Recreation Manager Shirley Echevarria ("Echevarria").  Llanos was also supervised by Parks Principal Supervisor Mike Grattan ("Grattan"), who oversaw both District 8 and District 12, and Lawrence Scoones ("Scoones"), Chief of Operations of the Bronx.

A.   Harassment Claims

Llanos alleges various incidents of harassment by Dugal and by her subordinate employees while she worked in District 8. Her admissible evidence regarding these claims is set out below.

1. Dugal

Llanos interacted with Dugal daily, most frequently when she picked up her Parks Department vehicle each morning.  During these interactions, Dugal looked down her shirt at least four times.  When Llanos wore a t-shirt underneath her button-down uniform shirt, Dugal asked, "Why are you wearing a t-shirt underneath your uniform? I can't see anything."  Dugal also

asked Llanos to "stop cock-blocking" after she refused to assign a certain female JTP to work with him.[4]

Llanos felt intimidated by Dugal.  Dugal once grabbed a form Llanos had created to keep track of her work and threw it out saying, "I don't like that paperwork."  On other occasions, Dugal said to her, "You don't have anybody here [in the Parks Department] to protect you," and "You are a provisional, you can go at any time before I do."  Llanos also claims that Dugal "never spoke to [her] in proper terms" and generally referred to female employees in offensive terms.  According to Llanos, Dugal embarrassed her in front of her subordinates on several occasions, including by reassigning male employees under Llanos's supervision without her knowledge.  These reassignments made it difficult for Llanos to manage male CPWs and resulted in the male employees laughing at her at least once.

Llanos reported Dugal's behavior to Echevarria in several "informal conversations" prior to December 2009.  Llanos testified that, in these conversations, she explained feeling intimidated by Dugal and "the way that he would talk down to me and harass me."  On March 31, 2010, Llanos reported to Robert Wright, Chief of Recreation, and to Pete Jones, Deputy Chief of

---

[4] Dugal disputes using the term "cock-blocking" at work or in reference to Llanos.  Dugal testified that he understood the term to mean "doing something that prevents somebody from communicating or making an advance with someone else."

Recreation, that she was "having a hard time" with Dugal and that Dugal "had mentioned that [she] was cock-blocking."[5]

### 2.  District 8 CPWs

Llanos also asserts that she was verbally harassed by several male CPWs under her supervision in District 8, including Darryl Harley ("Harley"), Ray Cruz ("Cruz"), and a Mr. Rodriguez ("Rodriguez").  Harley, Cruz, and Rodriguez repeatedly asked Llanos out on dates, saying, "You want a man," or "Let me take you out."  According to Llanos, when she met Harley, his first words to her were, "If I don't get to sleep with you, I will still be your friend."  On another occasion, Harley asked her, "Who the hell did [you] fuck to get this job?"  After she refused Harley's advances, Llanos testified that he "made [her] life impossible" at work by refusing to work, cursing, and walking away from her, even during meetings when Llanos's supervisors were present.

Llanos reported to Dugal and Echevarria that she felt harassed by Harley.[6]  According to Llanos, after her conversation

---

[5] Llanos also testified that she "might have complained" about Dugal to Grattan, but Llanos states that she "was always afraid to say anything to Mr. Grattan because Mr. Dugal was his friend" and because she felt "afraid of" Dugal's "approaches and . . . demeanor."

[6] In reference to Harley, Cruz, and Rodriguez, Llanos also testified that she "tried to speak to [Dugal]" about them, but that it was a "waste of time" because Dugal was part of their "click."

with Dugal, Harley "stopped for a minute, then he was back at it again."  Llanos also felt that reporting Harley's behavior to Dugal or Grattan was "a waste of time" because they were Harley's friends and "there was no point" in discussing Harley's behavior with them.  Llanos also recalls that, in her conversation with Echevarria about Harley, Echevarria replied, "Oh, don't worry about it.  He's just a mouth."

B.  Disciplinary Action against Llanos

In 2008, Llanos was the subject of an investigation into missing items that she had purchased while working as manager of the Oval.  The initial investigation had concluded that Llanos "made purchases for [the] Williamsbridge Oval Recreation Center and to date is unable to account for several of the items purchased" and that purchased items "such as VHS tapes, toys, games and a digital camera were not found on site."

The matter was referred to Parks Advocate Pia Rivera ("Rivera"), who initiated a disciplinary proceeding against Llanos.  The "Charges and Specifications" drafted by Rivera alleged that Llanos:

> Engag[ed] in an activity that interferes with any activity of the agency or those of its officers or employees, in violation of . . . the Standards of Conduct of the Department of Parks and Recreation . . . . [and]

> Misappropriat[ed] or permitt[ed] any property or thing of value to be stolen from any City premises, in violation of . . . the Standards of Conduct of the Department of Parks and Recreation.

On November 5, 2009, Llanos entered into a negotiated Stipulation of Settlement with the Parks Department in which she plead guilty to the Charges and Specifications and agreed to pay a fine of $725.00.

    C.  Llanos's Diabetes

Llanos suffers from diabetes and discussed her diabetes with several of her supervisors, including Grattan, Echevarria, Dugal, and Tricia Vanderbeck ("Vanderbeck"), Deputy Chief of Operations in the Bronx.  In District 12, it was common practice for workers to eat lunch at approximately 11:30 a.m. or noon. In District 8, however, Parks Supervisors were expected to respond to telephone calls or other issues immediately, even around lunch time.[7]

Soon after she was transferred to District 8, Llanos asked Echevarria for an uninterrupted half-hour lunch break at a "reasonable time" each day to allow her to take her medication and regulate her blood sugar levels.  Once, when Dugal called Llanos on her way to lunch, she told him, "You know, I am diabetic."  Dugal and Echevarria continued to call Llanos

---

[7] Dugal and Echevarria both testified that, when working in District 8, they would often work through or partially through their lunch.  Dugal described District 8 as a "very needy community," with a large number of complaints called in during the day.  The calls are referred to as "311 complaints."

whenever they needed her to respond to a 311 complaint, at any time during the work day.

In March 2010, Llanos spoke to Vanderbeck about the fact that her diabetes had worsened and requested to eat lunch at a regular time to keep her condition under control.  Vanderbeck responded, "Oh, you will be all right."  Llanos also mentioned her request for an uninterrupted lunch break to Grattan, who told her to speak to Scoones.  Scoones scheduled a meeting with her to discuss the issue on April 5, but Llanos's employment was terminated before that meeting occurred.

D.  December 4 Accident

On December 4, 2009, Llanos was involved in an accident while driving a Parks Department vehicle.  Before Parks Department drivers take a vehicle out in the morning or move from one location to another, they are expected to inspect the vehicle and to fill out a "trip ticket" reporting any damage they find on the vehicle.  When a new driver takes over the vehicle, the new driver either continues her report on the same trip ticket form or begins a new trip ticket.  An employee involved in an accident while driving a Parks Department vehicle is required to fill out forms reporting any damage and, in certain circumstances, to call Central Communications to report the accident.  It is common for Parks Department vehicles in the Bronx to display some external damage.

9

On the morning of December 4, Llanos drove vehicle No. 5991 (the "Vehicle"), a pickup truck that was reserved for use by Parks Supervisors.  The driver's side door of the Vehicle had been damaged before Llanos picked it up that morning.  The door would not close, which in turn meant that the odometer did not work.  Llanos had not caused that damage.  Llanos admits that she should have but did not fill out a trip ticket recording the driver's side door damage before she took out the Vehicle that morning.

At 7:30 a.m., Llanos drove to Fort Independence Park to pick up a JTP, Janelle Vega ("Vega"), who had complained that she was working alone at the location and had requested a transfer to a new site.  With Vega in the Vehicle, Llanos began to drive away and hit a stationary bollard.  The accident caused damage to the Vehicle in the area between the wheel and the door on the passenger's side.

The parties dispute how Llanos responded to hitting the bollard.  Llanos asserts that she got out to inspect the damage, and that Vega also got out of the vehicle "cursing and carrying on."  According to Llanos, Vega told her "don't worry about" the accident, but Llanos responded, "No, I can't, no."  Vega reports that Llanos said she would not report the accident and would instead maintain that she found the Vehicle already damaged.

Llanos then drove to a different location, Henry Hudson, to drop off Vega.  Soon after Llanos and Vega arrived at Henry Hudson, however, Vega argued with three JTPs stationed at that location.  As a result, Llanos drove Vega to a third location, at Seton.  At some point later that day, Napolitano drove the Vehicle to pick up supplies.

Llanos admits that she was required to fill out a Vehicle Incident Report for the damage she saw on the driver's side of the Vehicle when she picked up the Vehicle on the morning of December 4 and an Accident Report for the damage she caused to the passenger's side of the Vehicle.  There is no dispute that on December 4, Llanos completed one report, a Vehicle Incident Report.  It is a one-page form stating that the Vehicle "was found with damage to passenger side door and cab" ("Incident Report").  Thus, the Incident Report wrongly describes the damage to the passenger's side of the Vehicle as damage "found" by Llanos when she picked up the Vehicle, and is an Incident as opposed to an Accident report.  The parties disagree, however, whether Llanos intentionally completed the Incident Report with this incorrect information.

E.  Investigation of the Accident

After Vanderbeck became aware of the damage to the passenger side of the Vehicle, she asked Echevarria to investigate.  On December 8, Dugal called Llanos into a

supervisory conference, which Echevarria also attended.  At the
conference, Llanos denied causing any damage to the Vehicle.
The post-conference report states that Dugal cautioned Llanos
because she "failed to perform [a] pre-trip inspection of [the
Vehicle] . . . failed to notify Central Communications of damage
to [the Vehicle] . . . [and] failed to complete trip tickets" on
December 3 and 4.  Llanos received two disciplinary "write-ups"
at that meeting, one of which faulted her for failing to
complete the trip ticket or call Central Communications to
report damage to the Vehicle on December 4.[8]

On December 9, the day after the supervisory conference,
Llanos requested and was granted medical leave for depression.
Llanos did not return from medical leave until March 10, 2010.[9]

On December 11, one week after the accident, Vega called
Echevarria to report her recollection of the December 4
accident.  Echevarria asked Vega to provide a written statement.
In Vega's statement, which she dates December 4, 2009, Vega
describes that

---

[8] The other "write-up" faulted Llanos for failing to perform her
requisite community service.

[9] Throughout her leave, Llanos met with a Parks Service Unit
("PSU") psychiatrist to discuss difficulties at work and how to
respond if she feels threatened by individuals with whom she
works.  The PSU psychiatrist recommended that Llanos take three
or four months of leave.  Llanos chose to return to work after
three months of leave for "family reasons."

as [Llanos] pulled off she crashed into [a] cement pillar
and the [Vehicle] got stuck on the pillar.  She kept
reversing and going forward and she could not get off of
the pillar.  After we drove away from Ft. Independence,
[Llanos] said that she was going to say that it was their
[sic] when she got it. . . .  She gave [the Vehicle] to Ray
[Napolitano].  Later on she asked me if I told anybody and
I said no, so she said if you did I have to say it was me,
so you did not say anything let Ray [Napolitano] take the
blame for it.

On March 29, 2010, after Llanos returned from medical leave, Investigator Jorge Real ("Real") interviewed Llanos regarding the damage to the Vehicle and the events of December 4.  A second investigator, Hanice Tavares, and Llanos's union representative, Robert Gervassi, also attended the interview. During the interview, Llanos admitted that she hit a pillar while driving the Vehicle.  Llanos told Real that she did not call Central Communications after the December 4 accident because she "only hit a stationary object."  She also told Real that she was "never really trained" and thought she only needed to report an accident to Central Communications if it involved hitting another moving vehicle.  With respect to her interactions with Vega immediately following the accident, Llanos told Real that she, Llanos, had insisted that they report the accident and that she never asked Vega to lie about the incident.

When Real asked Llanos why she wrote that she "found" damage to the Vehicle in the Incident Report, Llanos told Real

13

that "at the time that she wrote it, she was having problems with her diabetes and she was not in the right frame of mind and that was why she wrote something that was untrue." Real's interview report also states that Llanos

> contradicted her initial statement that she did not know she had to report [the accident], when she stated later that she originally had a Vehicle Accident Report [for the passenger's side damage] but she put it in her back pack and is not really sure where it is now, 'probably still at home.'

Real's interview report concluded that

> Ms. Llanos confessed to having the accident and I believe that she intended to cover-up [sic] it up, by only submitting an 'Incident Report,' where she stated that she 'found' damage. I believe that she submitted that document to mislead and not because of her claim that she has a [d]iabetic condition. I also believe that she told JTP Vega to lie about the accident if anyone asked.

Llanos explained in her deposition that she did not bring the Accident Report to her meeting with Real because Gervassi had not advised her that Real intended to discuss the December 4 accident with her that day.

After his interview with Llanos, Real submitted his report to and conferred with Deputy Parks Advocate Cheryl De Vonish ("De Vonish"). Real did not speak to Dugal, Echevarria, or Vega before completing his report.

E. Termination

After reviewing Real's report, De Vonish spoke to Rivera, her supervisor, about how to discipline Llanos. They considered

14

reducing Llanos's rank, but determined that Llanos did not have an underlying civil service title to which she could be demoted. Following e-mail correspondence with, among others, De Vonish, Rivera, Scoones, and Vanderbeck, De Vonish decided to terminate Llanos's provisional employment.

In reaching the termination decision, De Vonish relied on her conversations with Real and Rivera.  She also took into account Llanos's employment status, disciplinary history,[10] and the fact that Llanos was a supervisor and thus was held to a "higher standard."  De Vonish had concluded that Llanos had been involved in "serious" misconduct, namely that Llanos "was involved in a vehicle accident.  She had another employee in the vehicle at the time.  She failed to report it.  She damaged the vehicle.  And then after that she tried to suggest that someone else had done the damage to it."  De Vonish had never met Llanos, nor did she speak to or consult with Llanos, Dugal, or Echevarria prior to making the decision to terminate Llanos's employment.

After she was fired, Llanos filed a union grievance.  The grievance was denied based on a finding that no contractual

---

[10] In addition to the Oval settlement discussed above, three female JTPs had filed two complaints against Llanos during the time she worked as a manager of the Oval.  One complaint alleged that Llanos exhibited racist behavior and the other claimed that Llanos harassed the female JTPs at work.

violation had occurred.  Llanos filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 28, 2010.  She claimed discrimination on the basis of her race, national origin, sex, age, and disability.


II.  DISCUSSION

     The Parks Department has moved for summary judgment on each of the plaintiff's claims.  Summary judgment may not be granted unless all of the submissions taken together "show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts "in the light most favorable" to the nonmoving party.  Holcomb v. Iona Coll., 521 F.3d 130, 132 (2d Cir. 2008); see also Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456 (1992).

     Once the moving party has asserted facts showing that the non-movant's claims cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot "rely merely on allegations or denials" contained in the pleadings.  Fed. R. Civ. P. 56(e); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  "A party may not rely on mere speculation or conjecture as to the true nature of the facts to

overcome a motion for summary judgment," as "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted). Only disputes over material facts -- "facts that might affect the outcome of the suit under the governing law" -- will properly preclude the entry of summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts").

In cases involving allegations of employment discrimination, the court must exercise "an extra measure of caution" in determining whether to grant summary judgment "because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence." Schiano v. Quality Payroll Sys., Inc., 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted); see also Holcomb, 521 F.3d at 137. Even in an employment discrimination case, however, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment." Id. The ultimate test for summary judgment in discrimination cases, as in other cases, "is whether the evidence can reasonably support

a verdict in plaintiff's favor." James v. N.Y. Racing Ass'n,
233 F.3d 149, 157 (2d Cir. 2000).

A.  Preliminary Matters

The Parks Department has moved to dismiss all federal
claims based on discriminatory acts that occurred prior to
November 16, 2009, on the ground that only claims that accrued
in the final five months of Llanos's employment survive the
Title VII and ADA time bars.  For Title VII and ADA claims
arising in New York to be timely, a plaintiff must file the
charge with the EEOC within 300 days of the allegedly unlawful
employment practice.  42 U.S.C. § 2000e-5(e)(1); see Petrosino
v. Bell Atl., 385 F.3d 210, 219 (2d Cir. 2004).[11]  A hostile work
environment claim is treated as a continuing violation and thus
is considered timely if one "act contributing to the claim"
occurred within the 300-day period.  See Nat'l R.R. Passenger
Corp. v. Morgan, 536 U.S. 101, 117 (2002).

Llanos has clarified that her discrimination claims are all
premised on one adverse action -- the termination of her
employment -- which occurred after November 16, 2009, and that
she does not seek recovery for any adverse action that occurred

---

[11] Both New York State and New York City employment
discrimination claims are governed by a three-year statute of
limitations.  See N.Y.C.P.L.R. § 214(2); N.Y.C. Admin. Code § 8-
502(d).

prior to that date.  It is not necessary, therefore, to discuss this issue further.[12]

The Parks Department also moves to dismiss certain federal claims that it contends were not raised in Llanos's EEOC charge. Exhaustion of administrative remedies is "an essential element" of a Title VII claim.  Williams v. N.Y. City Housing Auth., 458 F.3d 67, 70 (2d Cir. 2006) (citation omitted).  "Claims not raised in an EEOC complaint, however, may be brought in federal court if they are 'reasonably related' to the claim filed with the agency."  Id.  A claim is reasonably related if "the conduct complained of would fall within the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination."  Mathirampuzha v. Potter, 548 F.3d 70, 76 (2d Cir. 2008) (citation omitted).

> [T]he 'reasonably related' inquiry requires a fact-intensive analysis.  In determining whether claims are reasonably related, the focus should be on the factual allegations made in the EEO charge itself, describing the discriminatory conduct about which a plaintiff is grieving. . . . It is the substance of the charge and not its label that controls.

Id. (citation omitted).

> Llanos's EEOC complaint states inter alia that

> [d]uring my employment, I repeatedly complained to my supervisors and/or management about the treatment female workers received on the job site(s).  During my employment

---

[12] Insofar as Llanos refers to acts that occurred prior to November 16, 2009, those acts may be admissible as evidence in support of a timely claim.  See Morgan, 536 U.S. at 113.

> I was repeatedly asked out by male employees.  When I did
> not go out with male employees, or said no to their
> requests, they stated I was 'gay'.  Most recently, on March
> 31, 2010, I complained about an abusive male employee; no
> action was taken.

The Parks Department contends that all hostile work
environment claims against Llanos's supervisor Dugal must be
dismissed since they are not "reasonably related" to the
harassment by subordinates described in the EEOC complaint.
Fairly read, Llanos's EEOC complaint is a general complaint
about the treatment of women, supported by some specific
examples.  This prong of the summary judgment motion is
therefore denied.

   B.  Discrimination

Llanos claims that she was fired because of her race and
gender in violation of Title VII, NYHRL, and NYCHRL.  Title VII
provides that it is "unlawful employment practice for an
employer . . . to discharge any individual, or otherwise to
discriminate against any individual with respect to his
compensation, terms, conditions, or privileges or employment,
because of such individual's race, color, religion, sex, or
national origin."  42 U.S.C. § 2000e-2(a)(1).  "[A]n unlawful
employment practice is established when the complaining party
demonstrates that race, color, religion, sex, or national origin
was a motivating factor for any employment practice, even though
other factors also motivated the practice."  42 U.S.C. § 2000e-

2(m); see Holcomb, 521 F.3d at 137.  Thus, "[a]n employment

decision . . . violates Title VII when it is based in whole or

in part on discrimination."  Id. (citation omitted).

The same substantive standards apply to claims of

employment discrimination under Title VII and the NYHRL.

Vivenzio v. City of Syracuse, 611 F.3d 98, 106 (2d Cir. 2010).

Claims brought under NYCHRL are also analyzed using the same

framework as Title VII claims, Leibowitz v. Cornell Univ., 584

F.3d 487, 498 n. 1 (2d Cir. 2009), but "must be viewed

independently from and more liberally than their federal and

state counterparts."  Loeffler v. Staten Island Univ. Hosp., 582

F.3d 268, 278 (2d Cir. 2009) (citation omitted).  Thus, this

Opinion will draw on the legal standards found in Title VII

jurisprudence.

Claims of employment discrimination brought under Title VII

are analyzed using the burden-shifting framework set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-203 (1973).

To establish a prima facie case of discrimination under Title

VII, a plaintiff must demonstrate that: "(1) he is a member of a

protected class; (2) he was qualified for the position he held;

(3) he suffered an adverse employment action; and (4) the

adverse action took place under circumstances giving rise to

[an] inference of discrimination."  Reynolds v. Barrett, 685

F.3d 193, 202 (2d Cir. 2012).

> [A]n inference of discriminatory intent may be derived from
> a variety of circumstances, including, but not limited to .
> . . the employer's . . . invidious comments about others in
> the employee's protected group; or the more favorable
> treatment of employees not in the protected group; or the
> sequence of events leading to the [adverse action].

Leibowitz, 584 F.3d at 502 (citation omitted).  A plaintiff's

burden in presenting evidence to support a prima facie case is

"de minimis."  Sassaman v. Gamache, 566 F.3d 307, 312 (2d Cir.

2009) (citation omitted).

    If the plaintiff satisfies this initial burden, a

presumption of discrimination arises, and "the burden shifts to

the employer to come forward with a legitimate,

nondiscriminatory reason for the adverse employment action."

Spiegel v. Schulmann, 604 F.3d 72, 80 (2d Cir. 2010).  If the

defendant can offer such a reason, the presumption of

discrimination dissolves, and "the defendant will be entitled to

summary judgment unless the plaintiff can point to evidence that

reasonably supports a finding of prohibited discrimination."

Id. (citation omitted).  The plaintiff may do so by showing that

the defendant's reasons were pretextual or that the defendant's

reasons "were not the only reasons and that the prohibited

factor was at least one of the motivating factors."  Holcomb,

521 F.3d at 138 (citation omitted).  Although the burden of

producing evidence may shift between the parties under this

framework, the "ultimate burden of persuading the trier of fact

that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Reynolds, 685 F.3d at 202.

The plaintiff "bears the initial burden of establishing a prima facie case of discrimination." Holcomb, 521 F.3d at 138. The Parks Department does not contest the first three elements of the prima facie discrimination case as to Llanos.  Instead, the defendant argues that Llanos cannot satisfy the fourth element, namely, that the circumstances give rise to an inference of discrimination.

The Parks Department is entitled to summary judgment on Llanos's discrimination claims.  Llanos makes two principal arguments in support of her discrimination claims, both of which fail to sustain an inference that she was fired because of her race or gender.

Llanos's complaint of discrimination based on her Hispanic race rests entirely on her assertion that two non-Hispanic males, who were also Parks Supervisors, were treated less harshly than she was in their disciplinary proceedings.  "A showing of disparate treatment -- that is, a showing that the employer treated plaintiff less favorably than a similarly situated employee outside h[er] protected group -- is a recognized method of raising an inference of discrimination for purposes of making out a prima facie case."  Mandell v. County

of Suffolk, 316 F.3d 368, 379 (2d Cir. 2003) (citation omitted).
In order to raise an inference of discrimination by showing
disparate treatment, however, the plaintiff must show she was
"similarly situated in all material respects" to the individuals
with whom she seeks to compare herself.  McGuinness v. Lincoln
Hall, 263 F.3d 49, 53 (2d Cir. 2001) (citation omitted).  In
this analysis, there must be an "objectively identifiable basis
for comparability" between the plaintiff and the comparator
employee, which includes an assessment of "whether the conduct
for which the employer imposed discipline was of comparable
seriousness."  Graham v. Long Island R.R., 230 F.3d 34, 40 (2d
Cir. 2000) (citation omitted).

Llanos has not provided evidence that Parks Supervisors
Napolitano and Vialet were treated more favorably that she was
in comparable disciplinary proceedings.  Llanos testified that
neither Napolitano nor Vialet was subject to any disciplinary
action for failing to report the damage caused to the driver's
side door of the Vehicle.  She also claims that on one occasion,
Dugal and Echevarria asked Llanos to sign a written warning
acknowledging that she had left a check in one of the park
buildings, but did not punish Vialet after it was established
that he was the person responsible for leaving the check behind.

There are several reasons that the disciplinary records for
Napolitano and Vialet do not support an inference that the

24

decision to fire Llanos was motivated by her race.  First, Llanos has not presented evidence that either man should have been disciplined for causing any damage to the Vehicle.  She has presented no admissible evidence that Napolitano or Vialet damaged either the Vehicle or any other Parks Department vehicle, much less that they failed to report damage they had caused.  Llanos also fails to offer evidence that either Napolitano or Vialet had a history of disciplinary infractions comparable to her history, held provisional employee status, or were serving probationary periods, as was Llanos at the time of her disciplinary proceedings.  But for the fact that Napolitano and Vialet held the same title of Parks Supervisor, Llanos has not established that either Napolitano or Vialet "shared sufficient employment characteristics with [her] so that they could be considered similarly situated."  McGuinness, 263 F.3d at 53.  As a result, Llanos has not demonstrated that either of her comparators are similarly situated to her "in all material respects" to support an inference that the difference in treatment may be attributable to discrimination.  Id. (citation omitted).

Llanos's principal theory of discrimination arises from her assertion that her employment was terminated due to gender discrimination.  She contends that the decision to terminate her

employment, while not discriminatory in itself,[13] was tainted by the discriminatory animus harbored by Dugal and Echevarria. This claim of discrimination fails as well.

Llanos has not shown that any person who was involved in any way in the decision to terminate her employment discriminated against her on account of her gender.  "[T]he impermissible bias of a single individual at any stage of the . . . process may taint the ultimate employment decision in violation of Title VII."  Bickerstaff v. Vassar Coll., 196 F.3d 435, 450 (2d Cir. 1999).  This remains true "even absent evidence of illegitimate bias on the part of the ultimate decision maker, so long as the individual shown to have the impermissible bias played a meaningful role in the . . . process."  Id.

It is undisputed that De Vonish was responsible for the decision to fire Llanos.  In making that decision, De Vonish relied on (1) the conclusions Real reached after his interview with Llanos, and (2) her consultations with Rivera regarding Llanos's employment status and disciplinary history.  Real, in turn, relied on Vega's written statement, the Incident Report, and his interview with Llanos.  Real concluded that Llanos

---

[13] Llanos does not allege that De Vonish made the decision to fire her based on her gender or race.  Nor does she argue that the individuals on whom De Vonish relied in making the decision, Rivera and Real, acted with any discriminatory intent.

"contradicted" herself, "intended to cover-up" the accident, and intended to "mislead" her supervisors by submitting an Incident Report which stated that she had "found" damage to the passenger side of the Vehicle.  Llanos does not contend that any of these individuals -- DeVonish, Real, Rivera or Vega -- was motivated by discrimination against her due to her gender.  Moreover, neither De Vonish nor Real conferred with Dugal or Echevarria regarding these events or their decision and recommendation.  In sum, there is no evidence that the decision-makers or those upon whom they relied in making the decision to terminate Llanos's employment were discriminating against Llanos because of her gender.

Llanos presents two arguments to suggest that there is a basis to find that she was fired because of her gender.  First, she asserts that she prepared an accident report concerning the damage she caused to the passenger side of the Vehicle ("Accident Report"), but that Dugal refused to accept it. Second, she contends that Echevarria was responsible for reporting Llanos's alleged cover-up of the accident.  She asserts that both Dugal and Echevarria were biased against her because of her gender, and that that bias motivated them to take these steps, which ultimately led to the decision to fire her. Llanos reasons that, but for their actions, she would never have been disciplined for the damage to the passenger's side of the

Vehicle or the alleged cover-up of the damage.  Neither of these
arguments succeeds in identifying disputed issues of fact that
would permit a jury to conclude that the termination of Llanos's
employment may be attributed to gender discrimination.

During discovery, Llanos produced the Accident Report which
she contends that she offered to Dugal, but which he refused to
accept.[14]  The Accident Report consists of six pages of forms
describing the damage Llanos caused to the passenger's side of
the Vehicle[15] and four pages of photographs.  In the Accident
Report, which is dated December 4, 2009, Llanos reports that on
December 4, at Fort Independence playground, she "put [the]
vehicle in drive and hit pillar" and caused "damage to passenger
side cab."

Llanos states that she completed the Incident Report and
Accident Report at the same time on December 4 but only gave the
Incident Report to Dugal two days later, on December 6.  When
she later realized that she had not given Dugal the Accident
Report, she presented the Accident Report to him.  Dugal,

---

[14] Although Llanos referred to a second report during her
interview with Real, she never produced the Accident Report
until discovery.  Llanos asserts that she did not provide it to
anyone in the Parks Department after Dugal refused to take it
because she did not know to whom she should submit it.

[15] The forms are: a one-page Property Damage/Theft Report; a one-
page Driver's Accident Report; a two-page Report of Motor
Vehicle Accident; a one-page Supervisor's Vehicular Accident
Evaluation Report; and a one-page Vehicle Incident Report.

however, refused to accept the Accident Report, telling her that she had already given him the forms, and it was "too much paper."[16]

Assuming as one must for purposes of this summary judgment motion, that Llanos did indeed complete an Accident Report in which she admitted that she had caused the damage to the passenger side of the Vehicle and that Llanos attempted to present the Accident Report to the Parks Department several days after the accident, Llanos has still failed to raise a question of fact that the decision to terminate her employment was motivated by gender discrimination.  This is true despite that fact that Llanos has presented evidence from which a jury could find that Dugal was biased against Llanos.  It remains undisputed that the disciplinary proceedings against Llanos arose from several sources unrelated to Dugal's actions and Dugal was not consulted in connection with the disciplinary process.

Llanos does not dispute that her Incident Report incorrectly stated that she had "found" the damage to the passenger side of the Vehicle, and that Vega called Echevarria on December 11 to report that Llanos planned to cover-up the damage and blame it on someone else.  Moreover, during her

---

[16] Dugal denies that Llanos ever presented him with the Accident Report or that he refused to accept it.

interview with Real, Llanos had a full opportunity to describe the events of December 4 and its aftermath. She has not presented any evidence that during that interview, in which she was accompanied by her union representative, she informed Real that she had presented the Accident Report to Dugal and that he had refused to accept it. To the contrary, she simply stated that she had placed an accident report in her backpack and it was probably still at home. Moreover, as described above, she does not contend that any of the persons who made the decision to fire her, or those upon whom they relied in making that decision, were motivated by discrimination against her. In sum, Dugal's refusal to accept a second report from Llanos does not create an issue of fact that the decision to terminate Llanos's employment was due to discrimination.

The second argument that Llanos offers in support of her gender discrimination claim is that she would not have been fired but for Echevarria's discrimination against her. Llanos does not dispute that Vega called Echevarria to volunteer a statement that Llanos had damaged the Vehicle and planned to cover-up the accident, or that Echevarria had a duty to report Vega's call. Llanos claims, however, that Echevarria discriminated against her by not conveying Llanos's "side of the story" to Vanderbeck along with Vega's statement. This argument

does not suggest that summary judgment should not be granted to the defendant.

Even assuming that Llanos has presented evidence that Echevarria (who is also a woman) was biased against her due to her gender, Llanos has provided no evidence that she ever admitted to Echevarria that she had damaged the Vehicle.[17] Moreover, Llanos was given the opportunity to make that admission to Real and did so. And, as already discussed, neither Real nor any other decision-maker consulted Echevarria in connection with the decision to discipline Llanos. Thus, even if Echevarria had acted with discriminatory animus, there is no indication that Echevarria's actions improperly affected the decision to terminate Llanos's employment.

Llanos has thus failed to carry her limited burden of establishing a prima facie case of discrimination. But, even if Llanos were able to establish a prima facie case of discrimination, the Parks Department has identified a legitimate, non-discriminatory reason for firing her. Llanos was a probationary employee with a disciplinary record. When an investigator determined that she had damaged a Parks Department vehicle and tried to cover up the accident, the defendant determined it should fire her. At this point, the burden

---

[17] Echevarria attended the supervisory conference at which Llanos took the position that she did not cause any damage to the Vehicle.

31

shifted to Llanos to present evidence from which a jury could
infer that that decision was motivated by discrimination against
Llanos.  For the reasons just described, the plaintiff has
failed to show that the reason given by the Parks Department for
firing Llanos was pretextual or that there is any other basis to
find that Llanos was fired due to discrimination based on race
or gender.

    C.  Retaliation

    The Parks Department is also entitled to summary judgment
on Llanos's retaliation claims.  It is an unlawful employment
practice to discriminate against an employee "because he has
opposed any practice made an unlawful employment practice by
[Title VII]" or the ADA.  42 U.S.C. § 2000e-3(a) (emphasis
supplied); see 42 U.S.C. § 12203(a).  Retaliation claims under
Title VII and the ADA are analyzed under the same burden-
shifting framework employed for considering claims of
discrimination.[18]  See Kaytor v. Elec. Boat Corp., 609 F.3d 537,
552 (2d Cir. 2010); Treglia v. Town of Manlius, 313 F.3d 713,
721 (2d Cir. 2002) (applying the framework to a retaliation

---

[18] Thus, a court considers, first, whether the plaintiff has
established a prima facie case of retaliation; second, whether
the defendant can articulate a "legitimate, non-retaliatory"
reason for the allegedly retaliatory action; and third, whether
the plaintiff has produced evidence that retaliation was "a
substantial reason" for the adverse action.  Fincher v.
Depository Trust and Clearing Corp., 604 F.3d 712, 720 (2d Cir.
2010).

claim under the ADA); Weissman v. Dawn Joy Fashions, Inc., 214
F.3d 224, 234 (2d Cir. 2000) (applying ADA analysis to
plaintiff's retaliation claim under both the NYHRL and NYCHRL).
To establish a prima facie case of retaliation, a plaintiff must
show

> (1) that she participated in an activity protected by Title
> VII, (2) that her participation was known to her employer,
> (3) that her employer thereafter subjected her to a
> materially adverse employment action, and (4) that there
> was a causal connection between the protected activity and
> the adverse employment action.

Kaytor, 609 F.3d at 552.[19]  The plaintiff's burden in making a
prima facie claim of retaliation "is de minimis, and the court's
role in evaluating a summary judgment request is to determine
only whether proffered admissible evidence would be sufficient
to permit a rational finder of fact to infer a retaliatory
motive."  Hicks, 593 F.3d at 164 (citation omitted).

　　　Llanos contends that Dugal and Echevarria retaliated
against her for complaining about a hostile work environment and
for requesting a reasonable accommodation for her diabetes, and
asserts that their retaliatory animus infected the decision to
fire her.  Llanos claims that, acting in retaliation against
her, Dugal refused to accept the Accident Report when Lanos

---

[19] While the NYCHRL is "broader" than its state and federal
counterparts with respect to retaliation claims in that it does
not require a materially adverse action to maintain a
retaliation claim, Fincher, 604 F.3d at 723, it is undisputed
that the plaintiff suffered a materially adverse employment
action in this case.

tendered it to him and Echevarria did not convey Llanos's side
of the story when she transmitted Vega's report about Llanos's
accident and cover-up.  In moving for summary judgment, the
Parks Department relies on the undisputed facts that neither De
Vonish nor Rivera nor Real harbored any retaliatory intent, knew
of any retaliatory motives of others against Llanos, or
consulted with either Dugal or Echevarria.

Llanos has failed to offer evidence demonstrating a causal
connection between her protected activities and the decision to
fire her.  For the reasons outlined in the previous section,
even assuming that Dugal or Echevarria acted with retaliatory
animus, no evidence has been proffered that decisions taken by
Real, Rivera, or De Vonish were affected by Dugal or
Echevarria's motives.  Thus, Llanos has failed to establish a
prima facie case of retaliation.

Even if Llanos were able to establish a prima facie case,
the Parks Department has identified a legitimate, non-
retaliatory reason for firing her.  And again, for the reasons
just described, Llanos has failed to show that this reason was
pretextual or that there is any other basis to find that she was
fired due to retaliation.

D.  Hostile Work Environment

Llanos claims that she suffered from a hostile work
environment based on her gender from the time of her appointment

to Parks Supervisor in District 8 through the termination of her employment.  The Parks Department contends that the wrongful conduct that Llanos has described is not sufficiently severe to constitute a hostile work environment.

Title VII prohibits "a discriminatorily hostile or abusive [work] environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  To prevail on a claim that harassment caused a hostile work environment in violation of Title VII, a plaintiff must establish "(1) that the workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of his or her work environment, and (2) that a specific basis exists for imputing the conduct that created the hostile environment to the employer." Petrosino, 385 F.3d at 221 (citation omitted).

Unlike claims of discrimination based on disparate treatment or retaliation, a hostile work environment claim is "based on the cumulative effect of individual acts." Morgan, 536 U.S. at 115.  A hostile work environment claim must, moreover, meet both an objective and subjective standard.  Not only must the victim herself "subjectively perceive [the] environment to be abusive," but the misconduct of which a plaintiff complains also must be "severe or pervasive enough to create an objectively hostile or abusive work environment." Petrosino, 385 F.3d at 221 (citation omitted).  "Isolated

incidents of offensive conduct, unless extremely serious, will not support a claim of discriminatory harassment." Id. at 223 (citation omitted). Rather, a plaintiff must demonstrate that her workplace was "permeated with discriminatory intimidation, ridicule, and insult, that [wa]s sufficiently severe or pervasive to alter the conditions of [her] employment." Gorzynski, 596 F.3d at 102 (citation omitted). Because Title VII prohibits only discriminatory workplace behavior, a hostile work environment arises only where the relevant conduct occurred "because of" the plaintiff's membership in a protected class. Petrosino, 385 F.ed at 221 (citation omitted).

Where the conduct creating a hostile work environment is committed by non-supervisory co-workers, the plaintiff must show that "the employer knew (or reasonably should have known) about the harassment but failed to take appropriate remedial action." Id. at 225. In contrast, "[w]here the harassment is attributed to a supervisor with immediate or successively higher authority over the employee, a court looks first to whether the supervisor's behavior culminated in a tangible employment action against the employee." Id. (citation omitted).[20] If such action was taken, the employer is held vicariously liable. Id.

---

[20] In this context, a tangible employment action "constitutes a significant change in employment status, such as hiring, [or] firing." Pa. State Police v. Suders, 542 U.S. 129, 144 (2004) (citation omitted).

The defendant contends that the objectionable conduct by Llanos's supervisor and by those that Llanos supervised was neither sufficiently severe nor pervasive to constitute a hostile work environment.  It does not argue that it was not on notice of the behavior.  Llanos has presented sufficient evidence from which a jury could conclude that she was subjected to a hostile work environment.  While no single incident is severe enough to constitute actionable conduct, taken as a whole, the conversations and behavior she describes raise a question of fact requiring a determination by a jury.

   E. Disability Discrimination: Reasonable Accommodation

   Llanos contends that the defendant failed to accommodate her diabetes by providing her with a regularly scheduled, uninterrupted half-hour break for lunch.  Title II of the ADA "proscribes discrimination against the disabled in access to public services."  Harris v. Mills, 572 F.3d 66, 73 (2d Cir. 2009) (citation omitted).  It provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  Id. (citing 42 U.S.C. § 12132).  "To assure those requirements are met, reasonable accommodation may have to be provided to the qualified individual."  Id. (citation omitted).  Where, as in

this case, a disabled plaintiff claims that she can perform a
particular job with a reasonable accommodation,

> the plaintiff's burden requires a showing that (1)
> plaintiff is a person with a disability under the meaning
> of the ADA; (2) an employer covered by the statute had
> notice of his disability; (3) with reasonable
> accommodation, plaintiff could perform the essential
> functions of the job at issue; and (4) the employer has
> refused to make such accommodations.

Graves v. Finch Pruyn & Co., Inc., 457 F.3d 181, 184 (2d Cir.
2006) (citation omitted).[21]

The Parks Department does not contest that Llanos has a
disability within the meaning of the ADA or that she notified
supervisors that she was a diabetic and wanted an uninterrupted
half-hour for lunch.  Indeed, at the time Llanos was fired she
had an appointment with a representative of the Parks Department
to discuss her request.  Instead, the defendant principally
argues that summary judgment should be granted because Llanos
has failed to provide any medical evidence that her requested
accommodation was medically necessary in order for her to
perform her job.

Before explaining why the Parks Department is entitled to
summary judgment on this claim, it is helpful to describe the

---

[21] Aside from the broader scope of covered disabilities under
NYHRL, a state law reasonable accommodation claim is "governed
by the same legal standards as govern federal ADA claims."
Graves, 457 F.3d at 184 n.3.  Thus, to the extent that Llanos
brings a state-law disability discrimination claim, it survives
or fails on the same basis as her ADA claim.

context in which Llanos presents her claim of disability discrimination.  This lawsuit was prompted by the termination of Llanos's employment, but Llanos does not connect that termination decision to any disability discrimination.  For instance, she does not argue that she damaged the Vehicle during the morning of December 4 because of her diabetes or because she was not given uninterrupted lunch breaks.  Nor does she contend that she filled out the Incident Report inaccurately because her lunch breaks were interrupted.[22]  Nor does she present any evidence, or even suggest, that her diabetes worsened because of the interruptions to her lunch breaks.[23]  Instead, she appears to argue that the failure to accommodate her requests for an uninterrupted lunch break increased the risk that her medical condition would worsen.  It is in this context that the Parks Department argues that it is entitled to summary judgment because Llanos has offered no medical evidence in support of this theory.[24]

---

[22] Llanos told Real that she made mistakes in filling out the Incident Report because she was having problems with her diabetes, but she made no mention that those problems were linked in any way to demands placed on her during meal times.

[23] Llanos's testimony only indicated that her diabetes had worsened after she returned from medical leave in March 2010.

[24] The parties have not addressed the issue of whether Llanos may be compensated under the disability discrimination laws for an increased risk of an adverse medical effect without any evidence

It is well established that a plaintiff "bears the burdens of both production and persuasion as to the existence of some accommodation that would allow her to perform the essential functions of her employment." McBride v. BIC Consumer Mfg. Co., Inc., 583 F.3d 92, 97 (2d Cir. 2009). A reasonable accommodation claim "fails unless the plaintiff establishes that an effective accommodation existed that would render her otherwise qualified." Jackan v. N.Y. State Dept. of Labor, 205 F.3d 562, 566 (2d Cir. 2000) (citation omitted).

> The burden of persuasion on the existence of an effective accommodation is not satisfied by mere speculation. For example, an employee with a severe motor disorder could not successfully carry her burden of persuasion by asserting that she would have been qualified to perform the duties of her position with the assistance of a mechanical device that compensates for her disorder. She would need to demonstrate that such a device existed and was available to her employer.

Id. at 566-67.

Similarly, to support her failure-to-accommodate claim, Llanos must do more than simply declare that her diabetes required an uninterrupted thirty-minute lunch break. Llanos must provide expert medical evidence to that effect and she has provided no such evidence. Given this record, Llanos has not presented prima facie evidence that she was improperly denied a reasonable accommodation for her diabetes.

---

that the risk was realized or that Llanos's condition affected her ability to work.

CONCLUSION

The defendant's June 1, 2012 motion for summary judgment is granted as to the claims of discrimination and retaliation. Summary judgment is denied with respect to Llanos's claim that she experienced a hostile work environment.


SO ORDERED:

Dated:     New York, New York
           November 7, 2012

                              _____
                                   DENISE COTE
                         United States District Judge